1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

| HTC Corporation and HTC America, Inc. | CASE NO.:  2:16-cv-1984 |
|---|---|
| Plaintiffs, | |
| v. | **COMPLAINT FOR:**<br>**(1) BREACH OF CONTRACT;**<br>**(2) BREACH OF THE IMPLIED** |
| Nokia Corporation, Nokia Technologies Oy, Nokia Solutions and Networks Oy, Nokia Solutions and Networks US LLC, Nokia USA Inc., Alcatel-Lucent S.A., and Alcatel-Lucent USA Inc., | **COVENANT OF GOOD FAITH &**<br>**FAIR DEALING; and**<br>**(3) PROMISSORY ESTOPPEL.**<br><br>JURY DEMAND |
| Defendants. | |

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

**COMPLAINT FOR BREACH OF CONTRACT**
CASE NO. 2:16-CV-1984

**WILSON SONSINI GOODRICH & ROSATI**
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

# INTRODUCTION

1.      Plaintiffs HTC Corporation and HTC America, Inc. (collectively, "HTC") bring these claims to require Defendants Nokia Corporation, Nokia Technologies Oy, Nokia Solutions and Networks Oy, Nokia Solutions and Networks US LLC, Nokia USA Inc., Alcatel-Lucent S.A., and Alcatel-Lucent USA Inc. (collectively, "Nokia"), to abide by their promises to license certain patents—patents that Nokia itself deemed "essential" to the standards adopted by the cellular and wireless technology industry—on terms that are "fair, reasonable, and nondiscriminatory" or "FRAND".

2.      Today's technology markets are increasingly dependent on the orderly and consensus-based adoption of various "standards" within particular industries.  According to the Federal Trade Commission, the promulgation and adoption of technology standards "are widely acknowledged to be one of the engines of the modern economy" and "serve as a fundamental building block for international trade."[1]  Cellular and wireless technology, and the companies that manufacture mobile devices that use that technology, are especially dependent on standards. The widespread adoption of uniform standards is critical to the interoperability of phones, tablets, and other mobile devices and has propelled the rapid advancement of these globe-changing products.  In addition to developers and providers, consumers benefit tremendously from these accepted standards because they provide freedom to choose the best products at the lowest prices.

3.      In order to practice industry standards, it is often necessary for the market to use patented technology that is "essential" to that particular standard.  To protect companies from the possibility that patent holders will abuse their market power, engage in patent hold-up, or demand unreasonable terms once their technology has been chosen, the markets depend on a licensing paradigm known as FRAND—i.e., that licenses for these "essential" patents will be

---

[1] U.S. Dep't of Justice and U.S. Fed. Trade Comm'n, *Antitrust Enforcement and Intellectual Property Rights: Promoting Competition and Innovation April 2007 Report* (Apr. 17, 2007), https://www.justice.gov/sites/default/files/atr/legacy/2007/04/17/intro.pdf.

COMPLAINT FOR BREACH OF CONTRACT
CASE NO. 2:16-CV-1984 - 2

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

available on license terms that are fair, reasonable, and non-discriminatory to anyone who seeks to practice the standard.  As its name suggests, FRAND pricing ensures an equal playing field (regardless of negotiating power) and controls the pricing to license standard-essential patents. In doing so, FRAND terms encourage development, collaboration, and competition.

4.      This dispute involves the technology standards underlying the world's cellular networks, including second generation (2G), third generation (3G), and fourth generation (4G) telecommunications standards, as well as wireless local area network ("WLAN") standards.  As cellular and wireless technologies became a pervasive part of daily life for billions of people around the globe, Nokia sought to capitalize on that explosive growth by participating in international standards-setting organizations, such as ETSI[2] and the IEEE-SA.[3]  Then, pursuant to ETSI's and the IEEE-SA's policies, Nokia and its subsidiaries and affiliates began designating thousands of its patents as "essential" to ETSI's telecommunications standards and the IEEE-SA's wireless standards.  Having voluntarily designated its technology as "essential" to these standards—a designation that Nokia itself sought—Nokia is now bound to offer licenses to these patents on FRAND[4] terms.  In other words, Nokia is contractually obligated to offer license terms that are fair, reasonable, and non-discriminatory to each and every company that needs and is willing to pay for a license to these patents.

5.      HTC—a leading manufacturer of mobile products that has consistently demonstrated its respect for intellectual property and patent rights—is one such licensee and has

---

[2] Short for the European Telecommunications Standards Institute, ETSI produces global standards for Information and Communications Technologies (ICT), including fixed, mobile, radio, converged, broadcast and Internet technologies.  ETSI is a not-for-profit organization with more than 800 member organizations in 68 countries and five continents.

[3] Analogous to ETSI, the Institute of Electrical and Electronics Engineers Standards Association, the IEEE-SA produces the global standards in a broad range of disciplines, including electric power and energy, biomedical technology, information technology, information assurance, telecommunications, consumer electronics, transportation, aerospace, and nanotechnology.

[4] Although the IEEE-SA uses the term RAND (reasonable and nondiscriminatory) rather than FRAND, the two terms are generally used interchangeably by the industry.

1   been so since 2003.  Specifically, HTC has held a license to Nokia's portfolio of standards-

2   essential patents ("SEPs") since 2003 and has made significant payments to Nokia over the years

3   to maintain that license.  Although the current Nokia/HTC license terms are confidential,

4   publicly-available information makes plain that Nokia has profited handsomely from its SEP

5   portfolio from the myriad of companies that practice these standards, including HTC.

6          6.     In addition to making substantial payments to Nokia, HTC has also contributed to

7   the widespread adoption of telecommunications and wireless standards, particularly 3G and 4G

8   standards, and their subsequent advancement throughout the globe.  HTC made those

9   investments in reliance on the promises by Nokia (and other SEP holders) that HTC would

10  receive FRAND pricing for the life of the telecommunications SEPs.  Thanks in part to HTC's

11  early adoption of 3G and 4G, and its subsequent years of innovation, HTC helped turn Nokia's

12  SEPs into a very lucrative asset that Nokia has been enjoying for years.

13         7.     Years later, as the industry licenses are coming due for renegotiation, Nokia is

14  breaching its promises to adhere to FRAND principles.  Instead, Nokia is abusing its patent

15  position and making unreasonable licensing demands that do not reflect market realities or any

16  objective FRAND royalty valuation methodology.

17         8.     HTC's SEP license with Nokia, for example, is set to expire on December 31,

18  2016.  HTC has communicated its willingness to license Nokia's SEPs, and is seeking to enter a

19  new license to Nokia's SEP portfolio.  Times have changed though, and the market conditions

20  today are not the same as when the parties first negotiated this license in 2003.  In 2003, for

21  example, the cellular industry was growing exponentially, Nokia was a market leader with

22  superior negotiating power, and HTC's own revenues were growing at an incredible rate.

23         9.     Today, the world looks very different.  2G and 3G are now legacy technologies,

24  and even 4G will soon give way to the next generation of telecommunications standards.  Far

25  from the market leader it once was, Nokia underwent a meteoric collapse until its handset

26  business was acquired by Microsoft.  Likewise, the product features driving pricing and

27  consumer demand now have nothing to do with 2G, 3G, or 4G technology (e.g., camera

COMPLAINT FOR BREACH OF CONTRACT
CASE NO. 2:16-CV-1984 - 4

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

functionality, storage capacity, touch screen, user interface, operating system, and applications).

Further, Nokia's SEPs have begun to expire at a rapid rate—a trend that will only accelerate over

the life of the license at issue here.  Finally, like other manufacturers in this industry, the average

selling price (ASP) for HTC's mobile devices (despite increasingly superior product features)

has dropped dramatically in recent years.

10.     With declining growth, new technologies and features, an expiring patent

portfolio, and lower ASPs, the value of Nokia's SEPs are significantly in decline.  Rather than

acknowledging this reality—which it must under FRAND principles—Nokia is demanding

licensing fees that are unreasonable and unsupported by any defensible valuation methodology.

Nokia publicly acknowledges as much.  For example, Nokia unflinchingly demands royalties

based on the overall value of the entire smartphone or tablet computer.  The shortcomings to

this methodology are obvious, i.e., it does not account for the product features that

manufacturers, like HTC, have added to their devices over the last 13 years or the emergence of

alternative and next-generation technologies.  Because they are divorced from market

conditions, Nokia's demands are inherently unreasonable and unfair.

11.     To be clear, HTC does not dispute that there is some value left in Nokia's SEP

portfolio or that HTC should pay a fair and reasonable rate to license Nokia's SEP portfolio.  But

Nokia's 2G, 3G, and 4G SEPs are worth substantially less today than they were when the

industry first adopted the standards in the early 2000s, and Nokia is obligated to offer license

terms that are fair and reasonable under current circumstances.  Because Nokia did not provide a

fair and reasonable valuation methodology for its SEP portfolio, HTC has done that work

itself.  Specifically, HTC commissioned experts from the telecommunications field and industry

to evaluate Nokia's SEP portfolio using standard intellectual property valuations.  These

evaluations revealed that the actual fair and reasonable value of Nokia's SEPs is substantially

less than what Nokia is demanding.  Accordingly, HTC responded to Nokia's demands by

making an offer that is fair, reasonable, and consistent with the valuations performed by HTC's

industry experts.  Nokia, however, rejected HTC's fair and reasonable offer.

COMPLAINT FOR BREACH OF CONTRACT
CASE NO. 2:16-CV-1984 - 5

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

12.     Nokia's licensing practices not only violate its contractual obligations to license its SEPs on FRAND terms, but it also violates black-letter patent law, especially recent case law regarding reasonable royalties calculations.  For example, FRAND royalties must use the proper royalty base and a proper royalty rate.  And FRAND royalties must reflect the actual technical contribution of the patented technology—rather than (a) the value of all the technologies incorporated in an entire standard, (b) the "lock in" value that arises from standardization of technologies—in which technologies gain value simply because companies must use them as part of the standard, and (c) the value of an entire device embracing many technologies beyond the standard.

13.     As a matter of black-letter patent law regarding patent valuation, patent royalties are typically determined from a royalty base that begins with the smallest saleable unit that substantially embodies the patented functionality—and that base may need to be further apportioned to isolate the value of the patented invention.  And the royalty rate applied to that base must be reasonable and recognize other royalties levied by other patent holders on the royalty base—to avoid the problem of an unduly high total "royalty stack."  The final royalty calculation must also account for end products that incorporate already-licensed components, such as chip components sold to HTC by a licensed manufacturer.

14.     Nokia's royalty rates from its 2003 agreements with HTC pre-date many of the landmark cases outlining these basic patent valuation principles, but the new and forward-looking license must reflect these changes in patent law to be considered fair and reasonable.

15.     By demanding unreasonable and unfair rates, Nokia is abusing its market power and its patent protection, in clear breach of its contractual obligations and breaking its promises to ETSI, the IEEE-SA, HTC, and all of the other adopters of 2G, 3G, 4G, and WLAN technologies.  If allowed, Nokia's improper demands will result in significant damages to HTC, frustrate HTC's ability to offer competitively-priced products, and inhibit innovation.  And if left unchecked, Nokia's abusive practices will not only disrupt the wireless industry and increase costs but will embolden holders of other essential patents (in this industry and others) to demand

1   extortionate rates when their own licenses come up for renewal, thereby undercutting the

2   FRAND licensing paradigm that is necessary to build trust and consensus and encourage

3   investment in nascent or emerging standards in the first place.

4        16.     Accordingly, HTC brings this complaint for (i) breach of contract; (ii) breach of

5   the implied covenant of good faith and fair dealing; and (iii) promissory estoppel; and seeks

6   relief in the form of: (i) a judicial declaration that Nokia's FRAND promises constitute

7   contractual obligations that are binding and enforceable by HTC; (ii) a judicial declaration that

8   Nokia has breached these obligations by demanding excessive and discriminatory royalties from

9   HTC; (iii) a judicial decree enjoining Nokia from further demanding excessive royalties from

10  HTC that are not consistent with Nokia's FRAND obligations; (iv) a judicial accounting of what

11  constitutes a FRAND royalty rate consistent with Nokia's promises to license its patents

12  identified as (or alleged to be) essential to the 2G, 3G, 4G, and WLAN standards.

13  **THE PARTIES**

14       **A.**     **HTC**

15       17.     Plaintiff HTC Corporation is a Taiwanese corporation with its principal place of

16  business at 23 Xinghua Road, Tayouan 330, Taiwan, R.O.C.

17       18.     Plaintiff HTC America Inc. ("HTC America") is a Washington corporation with

18  its principal place of business at 308 Occidental Ave S, Seattle, WA 98104.  HTC America is a

19  wholly-owned American subsidiary of HTC Corporation that sells cellular and wireless devices

20  in the United States.

21       19.     Founded in 1997, HTC is a pioneer in the smartphone market, credited with many

22  industry firsts and technology breakthroughs over the past 19 years—a history defined by

23  innovation, design and engineering excellence, and the building of strategic partnerships to

24  facilitate the development of an industry ecosystem.  HTC has invested heavily in research and

25  development, which accounts for about a third of its employees.

26       20.     HTC's growth accelerated dramatically in the early 2000s when it was selected to

27  be Microsoft's first hardware platform development partner for the Windows Mobile operating

COMPLAINT FOR BREACH OF CONTRACT
CASE NO. 2:16-CV-1984 - 7

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

system (based on Windows CE).  HTC similarly partnered with Google to build the first mobile

phone running Google's Android mobile OS, the G1.  Through these efforts, and others, HTC

was amongst the pivotal players that adopted and advanced 3G technology, including its

introduction to, and widespread adoption by, consumers around the globe.  By 2005, HTC's

annual sales revenue totaled more than $2 billion, and it was recognized as the fastest-growing

tech company in BusinessWeek's Info Tech 100.  Since then, the market has changed

significantly—both in terms of market share and overall growth.

### B.   NOKIA

21.     On information and belief, Defendant Nokia Corporation is a Finnish corporation

with its principal place of business in Espoo, Finland.

22.     On information and belief, Defendant Nokia Technologies Oy ("Nokia

Technologies") is a Finnish corporation.  On information and belief, including through its

website,[5] Nokia Technologies has its principal place of business and headquarters in Sunnyvale,

California, and has offices in Los Angeles, California, San Francisco, California, and Boston,

Massachusetts.  Nokia Technologies is a wholly-owned subsidiary of Nokia Corporation that

develops, owns, and licenses standards-essential patents as part of Nokia's SEP portfolio.

23.     On information and belief, Defendant Nokia Solutions and Networks Oy ("NSN

Oy") is a Finnish corporation with its headquarters in Espoo, Finland and an office in Redmond,

Washington.  NSN Oy is also a wholly-owned subsidiary of Nokia Solutions and Networks B.V.,

which is a wholly-owned subsidiary of Nokia Finance International B.V., which is a wholly-

owned subsidiary of Nokia Corporation.  On information and belief, including through

negotiation communications from Nokia Technologies to HTC, Nokia Solutions and Networks

Oy develops and owns standards-essential patents that are part of Nokia's SEP portfolio.

24.     On information and belief, Defendant Nokia Solutions and Networks US LLC

("NSN US") is a Delaware limited liability corporation with its principal place of business in

---

[5] Available at http://www.nokia.com/en_int/about-us/who-we-are/our-businesses/nokia-technologies.

COMPLAINT FOR BREACH OF CONTRACT
CASE NO. 2:16-CV-1984 - 8

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

1   Irving, Texas and an office in Redmond, Washington.  On information and belief, NSN US has a

2   single governing member, Ricky Corker at 6000 Connection Drive, Irving Texas 95039.  NSN

3   US is a wholly-owned subsidiary of Nokia Solutions and Networks Holdings USA Inc., which is

4   a wholly-owned Delaware subsidiary of Nokia Solutions and Networks B.V., which is a wholly-

5   owned Dutch subsidiary of Nokia Finance International B.V., which is a wholly-owned Dutch

6   subsidiary of Nokia Corporation.  NSN US develops and owns standards-essential patents that

7   are part of Nokia's SEP portfolio.

8        25.   On information and belief, Defendant Alcatel-Lucent S.A. ("ALU") is a French

9   corporation with its principal place of business in Boulogne-Billancourt, France.  ALU is a

10  wholly-owned subsidiary of Nokia Corporation.  On information and belief, including through

11  negotiation communications from Nokia Technologies to HTC, ALU develops and owns

12  standards-essential patents that are part of Nokia's SEP portfolio.

13       26.   On information and belief, Defendant Alcatel-Lucent USA Inc. ("ALU USA") is

14  a wholly-owned subsidiary of Alcatel-Lucent S.A., which is wholly-owned subsidiary of Nokia

15  Corporation.  ALU USA is a Delaware company with its principal place of business in New

16  Providence, New Jersey.  ALU USA is a wholly-owned U.S. subsidiary of ALU that develops

17  and owns standards-essential patents that are part of Nokia's SEP portfolio.

18       27.   On information and belief, Defendant Nokia USA Inc. ("Nokia USA") is a

19  Delaware corporation with its principal place of business in Sunnyvale, CA.  Nokia USA is a

20  wholly-owned subsidiary of Nokia Corporation that develops and owns standards-essential

21  patents that are part of Nokia's SEP portfolio.

22       28.   Nokia Corporation was founded in 1865 and has engaged in various industries

23  during its 151-year history.  By the 1980s, Nokia was an industrial conglomerate with a fledgling

24  mobile phone business.  In the 1990s, Nokia began investing heavily in the development of

25  Global System for Mobile communications ("GSM") at a time when the cellphone industry was

26  highly fragmented with multiple vendors who looked at the market on a country-by-country

27  basis.  In 1998, Nokia overtook Motorola becoming the world's largest phone manufacturer.  In

1   2003, the top-selling mobile phone in the world was the Nokia 1100, which sold 250 million

2   units.  In 2007, Nokia had a market share of 80 percent of the smartphone market.  Since then,

3   Nokia has undergone a significant plummet and ultimately sold its mobile handset device

4   business to Microsoft in 2013.  Although its business is continually changing, today Nokia

5   Corporation, through its subsidiaries, such as Nokia Technologies, focuses on exploiting its

6   patent portfolios.

7                       **JURISDICTION AND VENUE**

8        29.     This Court has jurisdiction over the subject matter of this dispute pursuant to 28

9   U.S.C. § 1332 because this is an action between citizens of different states and because the value

10  of declaratory and injunctive relief sought, the value of HTC's rights this action will protect and

11  enforce, and the extent of the injury to be prevented exceed the amount of $75,000, exclusive of

12  interest and costs.

13        30.     On information and belief, Defendants are subject to this Court's general personal

14  jurisdiction, consistent with the principles of due process and the Washington Long Arm Statute,

15  at least because Defendants maintain offices and facilities in the Western District of Washington,

16  have employees in the Western District of Washington, offer products for sale in the Western

17  District of Washington, and/or have transacted business in this District, including directing

18  negotiation communications about the subject matter of this dispute with Seattle-based HTC

19  America Inc.  In addition to maintaining offices in Redmond, Washington, Defendants also have

20  offices throughout the United States, including Arizona, California, Connecticut, Florida,

21  Georgia, Illinois, Kansas, Maryland, Massachusetts, New Jersey, North Carolina, Ohio, Texas,

22  and Virginia.  Accordingly, Defendants transact substantial business in this District and

23  throughout the United States, and thus voluntarily avail themselves of the laws of the United

24  States and Washington so as to be subject to the jurisdiction of this Court.

25        31.     Defendants are also subject to specific personal jurisdiction in Washington.

26  Defendants seek to negotiate payments for a license covering products sold by HTC America,

27  which has its principal place of business in Seattle Washington.  Additionally, HTC Corporation,

COMPLAINT FOR BREACH OF CONTRACT
CASE NO. 2:16-CV-1984 - 10

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

on behalf of its subsidiary HTC America located in Washington, has been involved in negotiations with Nokia attempting to obtain a FRAND rate for the license that would be granted by Defendants.

32.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(a), 1391(c), and 1931(d).

## BACKGROUND

### A.     INTRODUCTION TO STANDARDS

33.     The development and adoption of industry standards is a critical aspect of today's technology market.  In simple terms, a standard provides rules or guidelines to achieve consensus and order in regards to a particular technology.  In the context of telecommunications technology, standards provide interconnection and interoperability so that users, who are increasingly mobile and use a variety of products from different manufacturers, can "mix and match" equipment, services, and providers.

34.     As the U.S. Federal Trade Commission has recognized:

> Industry standards are widely acknowledged to be one of the engines of the modern economy.  Standards can make products less costly for firms to produce and more valuable to consumers.  They can increase innovation, efficiency, and consumer choice; foster public health and safety; and serve as a "fundamental building block for international trade." Standards make networks, such as the internet and telecommunications, more valuable to consumers by allowing products to interoperate.[6]

35.     Technology standards are typically promulgated by entities known as "Standard Development Organizations" or "SDOs" whose participants voluntarily engage in the standards program to benefit their members and affiliates, including third parties implementing the standards, as well as the end users of the products.[7]

---

[6] U.S. Dep't of Justice and Fed. Trade Comm'n, *Antitrust Enforcement and Intellectual Property Rights: Promoting Competition and Innovation April 2007 Report* (Apr. 17, 2007), https://www.justice.gov/sites/default/files/atr/legacy/2007/04/17/intro.pdf.

[7] The engineers and developers who work on the technologies that are adopted by the SDOs are not employees of those SDOs. Instead, they are usually employees of companies in the industry, such as

(continued...)

**COMPLAINT FOR BREACH OF CONTRACT**
CASE NO. 2:16-CV-1984 - 11

**WILSON SONSINI GOODRICH & ROSATI**
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

36.     SDO participants enjoy significant potential benefits to having their technology adopted by the SDO.  Most obviously, when a standard is broadly adopted, the patent holder is likely to receive royalties (on a FRAND basis) from a large pool of adopters for many years.  But there are other benefits as well, including recognition as a leader in the industry, increased demand for the patent holder's other products, internal familiarity with the selected technology (potentially leading to a head start or shorter development times), and improved compatibility with products made by third parties that also use the adopted standard.

**B.     ETSI AND THE IEEE-SA, THEIR STANDARDS, AND THEIR INTELLECTUAL PROPERTY RIGHTS POLICIES**

37.     Several SDOs and other collaborations are relevant here.  As discussed above, ETSI is an independent, non-profit SDO that is responsible for the standardization of information and communication technologies, including mobile cellular technologies.  3GPP is a collaborative group of recognized SDOs in the information and communication industry, including ETSI.  ETSI and 3GPP have jointly worked together, and with others in the cellular industry, for years to develop broadly accepted standards for cellular technologies, including 2G, 3G, and 4G.  The IEEE Standards Association ("IEEE-SA") is the standards-setting arm of the IEEE.  The IEEE-SA promulgates technical standards in a variety of fields, including wireless communications and telecommunications.

38.     To ensure that adopters are not captive to abusive and anticompetitive practices by patent holders, ETSI and the IEEE-SA—like other SDOs—adopted rules, policies, and procedures that create a paradigm for disclosing and licensing patents that are "essential" to the standards under consideration.  These rules, policies, and procedures are set out in the intellectual property rights ("IPR") policies ("IPR Policies").

---

(...continued from previous page)
Qualcomm, Samsung, Alcatel-Lucent, Nokia, Motorola, Nortel, and others that are members of the SDOs and participate in the standard-setting process. Many of these companies file for patents that cover technologies they believe are essential to implement the standards.

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

39.     Many IPR Policies, including ETSI's and the IEEE-SA's, require participants to timely disclose any IPRs (such as patents or patent applications) that the patent holder reasonably believes will become essential to the standard under consideration.  These disclosures permit the SDOs and their members to evaluate technologies with knowledge of disclosed IPRs that may affect the costs of implementing the standard.  IPR Policies, including ETSI's and the IEEE-SA's, also require participants claiming to own relevant patents to grant licenses for those patents with any implementer of the standard on FRAND terms.

40.     ETSI's IPR Policy unambiguously requires the patent owner to grant irrevocable licenses on FRAND terms for patents that are essential to its standards.

41.     Specifically, Clause 6 of ETSI's IPR Policy states:

> When an ESSENTIAL IPR relating to a particular STANDARD or TECHNICAL SPECIFICATION is brought to the attention of ETSI, the Director-General of ETSI shall immediately request the owner to give within three months an irrevocable undertaking in writing that it is prepared to grant irrevocable licenses on fair, reasonable and non-discriminatory ("FRAND") terms and conditions.

42.     If the essential IPR owner refuses to undertake the requested commitment and informs ETSI of that decision, the ETSI General Assembly must "review the requirement for that STANDARD or TECHNICAL SPECIFICATION and satisfy itself that a viable alternative technology is available for the STANDARD or TECHNICAL SPECIFICATION" that is not blocked by that IPR and satisfies ETSI's requirements.  ETSI IPR Policy, cl. 8.1.1.  Absent such a viable alternative, the ETSI IPR Policy requires that "work on the STANDARD or TECHNICAL SPECIFICATION shall cease." *Id.*, cl. 8.1.2.  In other words, ETSI will not agree to incorporate a member's technology in a standard under consideration unless the member irrevocably binds itself to granting licenses on FRAND terms.

43.     The IEEE-SA had an IPR policy at the time it was drafting the 802.11 (WLAN) protocols.  Under the IPR policy, individuals participating in the IEEE standards development who believed an entity owned patents or patent applications that might be "essential" to

**COMPLAINT FOR BREACH OF CONTRACT**
CASE NO. 2:16-CV-1984 - 13

**WILSON SONSINI GOODRICH & ROSATI**
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

implement an IEEE standard under development, the IEEE-SA would request Letters of Assurance from those entities.

44.     The requirements for the Letters of Assurance sought by the IEEE are set forth in Clause 6 of the IEEE-SA Standards Board Bylaws.  Clause 6 of those Bylaws (which was revised slightly over the years) provides in pertinent part:

> A Letter of Assurance shall be either:
>
> a)  A general disclaimer to the effect that the submitter without conditions will not enforce any present or future Essential Patent Claims against any person or entity making, using, selling, offering to sell, importing, distributing, or implementing a compliant implementation of the standard; or
>
> b)  A statement that a license for a compliant implementation of the standard will be made available to an unrestricted number of applicants on a worldwide basis without compensation or under reasonable rates, with reasonable terms and conditions that are demonstrably free of any unfair discrimination.

45.     If the Letters of Assurance were not provided for patents asserted to be "essential" by participants, the IEEE working group either would revise the standard to avoid any potential issues related to those patents, discontinue work on the standard altogether, or otherwise proceed in a way that avoided exposure to discriminatory patent assertions and/or unreasonable licensing terms.

46.     IPR Policies are critical protections for all the market and those companies that build products using the adopted standard.  As the United States Federal Trade Commission recently explained,

> [SDOs] have this policy because the incorporation of patented technology into a standard induces market reliance on that patent and increases its value.   After manufacturers implement a standard, they can become "locked-in" to the standard and face substantial switching costs if they must abandon initial designs and substitute different technologies.  This allows [standard-essential patent] holders to demand terms that reflect not only "the value conferred by the patent itself," but also "the additional value—the hold-up value—conferred by the patent's being designated as standard-essential."   The FRAND commitment is a promise intended to mitigate the potential for patent hold-up.  In other words, it restrains the

COMPLAINT FOR BREACH OF CONTRACT
CASE NO. 2:16-CV-1984 - 14

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

exercise of market power gained by a firm when its patent is included in a standard and the standard is widely adopted in the market.[8]

47.     Thus, IPR Policies and members' commitment to encourage participants and affiliates to contribute their technologies to the standards and/or to implement the standards works to the benefit of consumers, who would be harmed by higher prices and fewer options if owners of standards-essential patents were able to demand unfair, unreasonable, or discriminatory licensing terms.

<u>Mobile Cellular and Wireless Standards</u>

48.     At issue here are Nokia's patents that Nokia itself claims are essential to the 2G, 3G, 4G, and WLAN standards.

49.     The mobile cellular technologies described by the 2G, 3G, and 4G standards (collectively the "Mobile Cellular Standards") are enabling second, third, and fourth generation technologies for mobile voice and data communications.  2G technology was a culmination of work that began in the 1980s as a replacement for first generation ("1G") analog cellular networks for voice communications.  The first 2G cellular telecom networks were commercially launched on the GSM standard in Finland in 1991.  The first GSM network became operational in the United States in 1995.

50.     The adoption of 3G and 4G technology was driven by the demand for greater transmission capacity and speed compared to the existing technologies available in earlier generation technology.  For example, 3G UMTS uses WCDMA (wideband CDMA), a technology used to increase the amount of data that can be exchanged on the bandwidth of mobile telecommunications.  3G mobile phones can, in addition to classic voice calls, transmit and receive data such as, for example, downloading of music and video files.

---

[8] U.S. Fed. Trade Comm'n, *Analysis of Proposed Consent Order to Aid Public Comment* In the Matter of Motorola Mobility LLC and Google Inc., *File No. 121-0120* (Jan. 2013), https://www.ftc.gov/sites/default/files/documents/cases/2013/01/130103googlemotorolaanalysis.pdf.

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

51.     A 4G network goes further.  4G LTE provides mobile ultra-broadband Internet access, for example to laptops with USB wireless modems, to smartphones, and to other mobile devices.  Many 4G networks are also compatible with legacy 2G and 3G systems.  This allows users to make connections regardless of their geographic location or type of mobile phone, and especially when operating in an area where there is no 4G network.  Thus, the majority, if not all, of the marketed 4G mobile phones can also function in 3G and/or 2G modes.

52.     WLAN or "Wi-Fi" and/or "802.11" ("Wireless Standards") is a widely practiced standard for wireless Internet connectivity that enables an electronic device to access the Internet wirelessly at high speeds over short distances.  WLAN networks typically consist of one or more access points that are connected to an Ethernet local area network, each of which communicates by radio signals with devices such as notebook computers and other electronics devices.  The use of WLAN technology has grown in the United States since its introduction in the 1990s.  Manufacturers now offer WLAN connectivity in a wide array of devices and for many different reasons and purposes.

<u>Nokia's Involvement in Development of the Wireless Standards</u>

53.     Nokia is a member of ETSI and 3GPP, and an alleged contributor to the ETSI standard.  Nokia declared numerous IPRs to ETSI, including United States patents and patent applications assigned to Nokia.  In addition, upon information and belief, Nokia has played a role in the 3GPP standardization process.

54.     As a 3GPP "Individual Member," Nokia is "bound by the IPR policy" of ETSI.  At various times, Nokia, along with its subsidiaries and affiliates, has declared to ETSI that a number of its patents and patent applications are or are likely to become essential to one or more of the Mobile Cellular Standards.  Consistent with, and pursuant to, ETSI's IPR Policies, Nokia has submitted an IPR Information Statement and Licensing Declaration for each patent or patent application it believes to be standard-essential.  In each such declaration, Nokia promised to "grant irrevocable license under the IPRs on terms and conditions which are in accordance with Clause 6.1 of the ETSI IPR policy."  Nokia has submitted at least 294 ETSI IPR Licensing

COMPLAINT FOR BREACH OF CONTRACT
CASE NO. 2:16-CV-1984 - 16

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

Declaration forms through which it has declared a large number of its United States and foreign patents and patent applications essential to the standards. Many of these patents and patent applications were assigned to and licensed by Nokia Corporation's wholly-owned licensing subsidiaries.

55.     In reliance on declarations such as the ones submitted by Nokia, ETSI released the Mobile Cellular Standards. Once Nokia disclosed that it held essential patents, absent a licensing commitment from Nokia that it would grant licenses to these patents on FRAND terms, ETSI would have: (1) revised the standards to employ alternative technologies, (2) stopped working on the standards, or (3) taken other action to ensure the Mobile Cellular Standards would be available for use by everyone on FRAND terms and conditions.

56.     In submitting its declarations in accordance with ETSI's IPR Policy, Nokia entered into a contract with ETSI for the benefit of ETSI members and any entity that implements and/or adopts the Mobile Cellular Standards. Nokia is bound by its agreements to license its patents consistent with the referenced ETSI IPR Policy. HTC is, therefore, a beneficiary of Nokia's contractual obligations and promises to ETSI.

57.     Nokia further clarified these commitments at the end of the 2015 when it announced its acquisition of Alcatel-Lucent. In exchange for approval of the deal by the Chinese Ministry of Commerce, Nokia made a series of commitments, including a promise, based on the principle of equality, that it would cease its pursuit of a standard-essential patent injunction to prevent implantation of standards with FRAND commitments.

58.     Similarly, Nokia is a member of the IEEE and an alleged contributor to the WLAN standard. Nokia declared numerous IPRs to the IEEE-SA, including United States patents and patent applications assigned to Nokia. In addition, upon information and belief, Nokia has played a role in the WLAN standardization process.

59.     Nokia submitted Letters of Assurance pursuant to Clause 6 of the IEEE-SA Standards Board Bylaws that it would offer to license any of its patents or patent applications that it identified as "essential" to the applicable WLAN standards to any entity under reasonable

COMPLAINT FOR BREACH OF CONTRACT
CASE NO. 2:16-CV-1984 - 17

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

rates on a non-discriminatory basis.  The IEEE and its participants and affiliates relied on Nokia's promises in developing, adopting and implementing the IEEE-SA technical standards. These standards are now implemented worldwide in a variety of electronic devices that have become commonplace.

## C.   HTC'S RELIANCE ON COMMITMENTS WITH RESPECT TO THE MOBILE CELLULAR AND WIRELESS STANDARDS

60.     In reliance on the integrity of the SDO process and the commitments made by Nokia regarding the IPRs that it deems essential, HTC developed, marketed, and sold its mobile phone products with the 3G, 4G, and/or Wi-Fi connectivity.

61.     HTC has invested substantial resources in developing and marketing products that implement these standards worldwide, including in the United States, and particularly in Washington.  HTC did so in reliance on the assurances of participating IPR holders—including Nokia—that any patents identified pursuant to ETSI's and the IEEE-SA's IPR Policies by such IPR holders would be licensed on FRAND terms, regardless of whether such IPRs were, in fact, used in any particular implementation.  Accordingly, HTC is a third-party beneficiary of Nokia's FRAND commitments to ETSI, 3GPP, and the IEEE-SA.

## D.   THE 2003 NOKIA/HTC LICENSING AGREEMENTS AND SUBSEQUENT DECLINING VALUE OF NOKIA'S SEPS

62.     In 2003, HTC signed a license to Nokia's portfolio of patents essential to the Mobile Cellular and Wireless Standards pursuant to its express understanding that the licenses were, and would remain, subject to FRAND pricing.  The agreement was amended in 2004 and again 2011 to expand coverage and duration.

63.     Although the terms of the 2003 license and amendments are confidential, they were negotiated in a different era when 2G, 3G, and 4G were cutting-edge technologies that represented a significant step forward in data capacity and speed.  The mobile device market was rapidly expanding, as smartphones were introduced to and embraced by both enterprise and individual consumers.

COMPLAINT FOR BREACH OF CONTRACT
CASE NO. 2:16-CV-1984 - 18

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

64.     The parties themselves were in very different positions as well.  HTC was a dominant market player whose growth was rapidly accelerating after being selected to be Microsoft's first hardware platform development partner for the Windows Mobile operating system (based on Windows CE).  HTC also partnered with Google to build the first mobile phone running Google's Android mobile OS, the G1.  HTC's sales revenue totaled more than $2 billion for 2005, and HTC was listed as the fastest-growing tech company in BusinessWeek's Info Tech 100.

65.     In the 1980s and 1990s, Nokia was also a dominant market player.  Since then, Nokia's market share and revenues have plunged.  Some commentators attribute Nokia's decline to its refusal to embrace features introduced by others, such as the touch screen, and failure to modernize its operating system—features that are all unrelated to the Mobile Cellular and Wireless Standards.  In a 2010 memo published by the Wall Street Journal, Nokia CEO Stephen Elop acknowledged that the market was dominated by companies like Apple not because of Apple's implementation of mobile telecommunications technology but because of advancements of well-designed applications:

> In 2008, Apple's market share in the $300+ price range was 25 percent; by 2010 it escalated to 61 percent.  They are enjoying a tremendous growth trajectory with a 78 percent earnings growth year over year in Q4 2010.  Apple demonstrated that if designed well, consumers would buy a high-priced phone with a great experience and developers would build applications.  They changed the game, and today, Apple owns the high-end range. …. [W]e have Symbian.  It has proven to be non-competitive in leading markets like North America.  Additionally, Symbian is proving to be an increasingly difficult environment in which to develop to meet the continuously expanding consumer requirements, leading to slowness in product development and also creating a disadvantage when we seek to take advantage of new hardware platforms.  As a result, if we continue like before, we will get further and further behind, while our competitors advance further and further ahead.[9]

66.     On February 8, 2012, Nokia Corporation announced 4,000 layoffs to take place at smartphone manufacturing plants in Europe by the end of 2012, to move assembly closer to

_____

[9] Stephen Elop, *Full Text: Nokia CEO Stephen Elop's 'Burning Platform' Memo*, Wall Street Journal Blog (Feb. 9, 2011), http://blogs.wsj.com/tech-europe/2011/02/09/full-text-nokia-ceo-stephen-elops-burning-platform-memo/.

**COMPLAINT FOR BREACH OF CONTRACT**
CASE NO. 2:16-CV-1984 - 19

**WILSON SONSINI GOODRICH & ROSATI**
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

component suppliers in Asia.  On June 14, 2012, Nokia announced 10,000 layoffs globally by the end of 2013 and shut production and research sites in Finland, Germany, and Canada in line with continuing losses and its stock price falling to its lowest point since 1996.  In total, Nokia laid off 24,500 employees by the end of 2013.  On June 18, 2012, Moody's downgraded Nokia's bond rating to junk.  Nokia's CEO admitted that the company's inability to foresee rapid changes in the mobile phone industry was one of the major reasons for the problems.

67.     On September 2, 2013, Microsoft announced that it would acquire Nokia's mobile device business.  Since then, Microsoft has laid off thousands of employees at manufacturing plants and research facilities from Redmond to Finland to China.  In December 2013, European Commissioner Joaquin Almunia said in a speech in Paris that he approved of the $7.2 billion sale but recognized the danger that Nokia will now attempt to "extract higher returns."[10]

### The Declining Value of Nokia's SEP Portfolio

68.     Since 2003, new technologies and product features—many of which have nothing to do with 2G, 3G, or 4G—have become prevalent and a driving force behind consumer demand.  As a result, the legacy 2G and 3G technologies, and even 4G technology, necessarily represent a smaller component of the overall product price.  HTC has introduced additional non-telecom features such as:  user interface enhancements, motion gesture, camera enhancements, audio enhancements, motion launch, flip to mute, and photo editor.

69.     Nokia's SEPs are not only less valuable today as a result of these other advancements, but the portfolio will dramatically reduce in coming years as many SEPs continue to expire.  On information and belief, at least one-third of Nokia's 2G, 3G, and 4G SEPs will expire between 2017 and 2020.  Meanwhile, the rate of new patents issued to Nokia has declined dramatically.  At a minimum, Nokia's expiring patents and declining invention rates should be taken into account for any new royalty rate.

---

[10] Joaquin Almunia, *IP Summit 2013 Press Release: Intellectual Property and Competition Policy*, European Commission (Dec. 9, 2013), http://europa.eu/rapid/press-release_SPEECH-13-1042_en.htm.

COMPLAINT FOR BREACH OF CONTRACT
CASE NO. 2:16-CV-1984 - 20

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

70.     On information and belief, in 2011, Nokia sold 2,000 wireless patents to MOSAID Technologies Inc. (now known as Conversant Intellectual Property Mangement Inc.) and its subsidiary Core Wireless Licensing, S.a.r.l., including about 1,215 essential patents.

71.     On information and belief, in 2012, Nokia sold 450 wireless and video patents and patent applications to Sisvel International, an Italian patent licensing company, including some 350 patents that were declared essential to standards for GSM, 3G, and 4G/LTE.

72.     On information and belief, in 2012, Nokia sold to Vringo, Inc. ("Vringo") more than 500 patents that, according to Vringo, "encompasses a broad range of technologies relating to cellular infrastructure, including communication management, data and signal transmission, mobility management, radio resources management and services.  Thirty one of the 124 patent families acquired have been declared essential by Nokia to wireless communications standards."

73.     On information and belief, in 2012, Acacia Research Corporation, through a subsidiary, acquired patents for wireless infrastructure and user equipment technology from Nokia Siemens Networks relating to 2G, 3G, and 4G wireless technologies.

74.     In addition to these examples, Nokia has likely entered additional transactions in which it sold or otherwise divested itself of additional SEPs that must be considered in assessing a reasonable royalty for its remaining portfolios.

## E.     NOKIA'S BREACH OF ITS OBLIGATION TO LICENSE ITS SEPS ON FRAND TERMS

75.     HTC's licenses to Nokia's SEPs are set to expire on December 31, 2016.

76.     HTC has repeatedly made clear its willingness and intention to enter new license agreements with Nokia, and that it will pay license fees that are fair and reasonable.  HTC has negotiated, and is prepared to negotiate, in good faith with Nokia to obtain FRAND rates for the licenses to all patents that Nokia has declared to be essential to the Mobile Cellular Standards.

77.     But with willful disregard of the commitments it made to ETSI, 3GPP, and the IEEE, Nokia has refused to provide HTC a FRAND rate to license Nokia's SEP portfolio. Instead, Nokia is exploiting the significant economic power it gained as a result of the purported

COMPLAINT FOR BREACH OF CONTRACT
CASE NO. 2:16-CV-1984 - 21

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

inclusion of its technology into the Mobile Cellular and Wireless Standards by demanding royalty payments that are wholly disproportionate to the royalty rate that its patents should command under any reasonable royalty determination, and far in excess of any independent value they would have absent their inclusion in the standards.

78.     When it became clear that Nokia would not offer a reasonable rate on its own, HTC retained two telecommunications industry experts to determine the value of Nokia's SEPs while taking into consideration other SEPs that may have been obtained through acquisitions of other companies, including Alcatel-Lucent.  Among other things, that analysis considered relevant market factors (e.g., slower industry growth, declining average selling price, lower margins), the technical merits of Nokia's SEP portfolio, the increasing importance of product features unrelated to Nokia's SEPs, emerging alternative technologies, and other well-established patent valuation principles.  The analysis demonstrated that Nokia's demand was in far excess of a rate that would be fair and reasonable.

79.     In HTC's market segment, profit margins are small or non-existent.  Therefore, any unfair or unreasonable royalty will significantly impact overall profit margin and prevent HTC from being competitive in the marketplace.  It is therefore essential for HTC to obtain FRAND rates for Nokia's SEPs.

80.     Absent the negotiating leverage that Nokia obtained through the standards process, Nokia would not have been in a position to exploit its essential patents to attempt to extort unreasonable terms from HTC.

81.     As the December 31, 2016 expiration of the 2003 license agreement, as amended, between Nokia and HTC approaches, HTC now faces loss of coverage from protection against patent infringement actions and exposure to a high risk of litigation in the United States and other jurisdictions, of devices that allegedly utilize Nokia's claimed essential patents.

82.     Notably, Nokia is among hundreds of companies with purported essential patents relevant to these technologies.  If each company with a FRAND commitment is permitted to charge excessive royalties, the burden on downstream products will leave little room for

COMPLAINT FOR BREACH OF CONTRACT
CASE NO. 2:16-CV-1984 - 22

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

1  profitability, discourage further investment, and chill device innovation and competition

2  altogether.  Not only would device manufacturers like HTC be harmed in their business, but so

3  too would consumers, who ultimately would suffer higher device prices and less innovation.

4  ## CLAIMS FOR RELIEF

5  ## FIRST CAUSE OF ACTION

6  ## (Breach of Contract)

7       83.    HTC realleges and incorporates by reference the allegations set forth in all of the

8  preceding paragraphs, as though fully set forth herein.

9       84.    Nokia entered into contractual commitments with ETSI, 3GPP, the IEEE and their

10 respective members, participants, and implementers relating to the Mobile Cellular and Wireless

11 Standards.

12      85.    Each third party that would potentially implement the Mobile Cellular and

13 Wireless Standards was an intended beneficiary of those contracts.

14      86.    HTC is an intended beneficiary of those contracts.

15      87.    Nokia was contractually obligated to offer a license to its SEPs consistent with the

16 applicable IPR policy of ETSI and 3GPP, including that such a license be on FRAND terms.

17      88.    Nokia was further contractually obligated to offer a license to its SEPs consistent

18 with the applicable IPR policy of the IEEE-SA, including that such a license be on RAND terms.

19      89.    Nokia has refused to offer a FRAND rate.  Instead, HTC understands that Nokia

20 is basing the demanded royalties for its SEPs on the value of entire devices (e.g., smartphones

21 and tablet computers).  The law requires, however, that royalties be set using as the royalty base

22 (at most) the smallest saleable unit that substantially embodies the patented technology, to which

23 a reasonable royalty rate is then applied.  For these patents, that royalty base would be (at most)

24 the baseband processor chip that performs telecommunications processing functions.  The law

25 also requires that the royalties be set to reflect the value of the patented technology alone.  For

26 Nokia's SEPs, that would acknowledge the decline in the significance of the technology,

27 including that this technology has declining impact on consumer demand.

COMPLAINT FOR BREACH OF CONTRACT
CASE NO. 2:16-CV-1984 - 23

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

90.     Nokia has refused to accept the FRAND rate calculated by HTC's telecommunications technology and market experts, who HTC hired to evaluate Nokia's SEP portfolio.  By failing to reduce rates to account for a declining value in its portfolio, Nokia is attempting to extract unfair and unreasonable rates by demanding rates higher than the fair and reasonable value of the patented technology.

91.     Nokia breached its contracts by refusing to license its SEPs under reasonable rates, with reasonable terms, and on a non-discriminatory basis.

92.     As a result of Nokia's contractual breach, HTC has been injured in its business or property, and is threatened by a gap in coverage from patent infringement protection and thus an imminent loss of profits, loss of customers and potential customers, and loss of goodwill and product image.

93.     HTC has suffered and will continue to suffer irreparable injury by reason of the acts, practices, and conduct of Nokia alleged above until and unless the Court enjoins such acts, practices, and conduct.

### SECOND CAUSE OF ACTION

### (Implied Covenant of Good Faith and Fair Dealing)

94.     HTC realleges and incorporates by reference the allegations set forth in all of the preceding paragraphs, as though fully set forth herein.

95.     Nokia has acted in bad faith by refusing to license Nokia's patents essential to the Mobile Cellular and Wireless Standards on  FRAND  terms and rejecting HTC's fair, reasonable, and nondiscriminatory offer, while forcing HTC to face loss of coverage from protection against patent infringement actions and exposing HTC to litigation in the United States and other jurisdictions, for devices that allegedly utilize Nokia's claimed essential patents

96.     Nokia has, accordingly, wrongfully and intentionally breached the covenant of good faith and fair dealing by denying HTC the benefits to which they are entitled under Nokia's FRAND obligations.

COMPLAINT FOR BREACH OF CONTRACT
CASE NO. 2:16-CV-1984 - 24

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

## THIRD CAUSE OF ACTION

### (Promissory Estoppel)

97.     HTC realleges and incorporates by reference the allegations set forth in all of the preceding paragraphs, as though fully set forth herein.

98.     Nokia made a clear and definite promise to licensees through its public commitments to ETSI, 3GPP, and the IEEE, and that it had granted, or would grant, to third parties licenses to any essential patents under reasonable rates, with reasonable terms, and on a non-discriminatory basis.

99.     The intended purpose of Nokia's promises was to induce reliance upon this promise so that companies like HTC would produce mobile phone products compatible with the relevant standards.  Nokia knew or should have reasonably expected to know that it would induce reliance on these promises by companies such as HTC.

100.    HTC developed and marketed its products and services in reliance on Nokia's promises, including making its products and services compliant with Mobile Cellular and Wireless Standards.

101.    HTC entered into license agreements with Nokia in reliance on Nokia's continued promises, including assurances that Nokia would continue to license its SEPs under reasonable royalty rates, with reasonable terms, and on a non-discriminatory basis.

102.    Nokia is estopped from reneging on these promises to ETSI, 3GPP, the IEEE and their respective members, participants, and implementers under the doctrine of promissory estoppel.

## PRAYER FOR RELIEF

WHEREFORE, HTC prays for relief as follows:

A.     Adjudge and decree that Nokia is liable for breach of contract;

B.     Declare that Nokia has not offered royalties to HTC under reasonable rates, with reasonable terms and conditions that are demonstrably free of any unfair discrimination;

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

C.     Enjoin Nokia from further demanding excessive royalties from HTC that are not consistent with Nokia's FRAND obligations;

D.     Declare that HTC is entitled to license from Nokia any and all patents that Nokia deems "essential" and/or has declared "essential" to the Mobile Cellular and Wireless Standards under reasonable rates, with reasonable terms and conditions that are demonstrably free of any unfair discrimination;

E.     Determine the FRAND rates that HTC is entitled to for each of the Mobile Cellular and Wireless Standards;

F.     Enter judgment awarding HTC a license from Nokia to any and all patents that Nokia deems "essential" and/or has declared "essential" to the Mobile Cellular and Wireless Standards under the Court's determined FRAND rate, with reasonable terms and conditions that are demonstrably free of any unfair discrimination;

G.     Enter judgment against Nokia for the amount of damages that HTC proves at trial, including, as appropriate, exemplary damages;

H.     Enter a judgment awarding HTC its expenses, costs, and attorneys' fees under applicable laws;

I.     Award HTC pre-judgment and post-judgment interest to the full extent allowed under the law, as well as its costs; and

J.     For such other and further relief as the Court deems just and proper.


Dated:  December 29, 2016

_____
Gregory Watts, WSBA #43995
**WILSON SONSINI GOODRICH & ROSATI**
Professional Corporation
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Telephone: (206) 883-2500
Facsimile: (206) 883-2699
Email: gwatts@wsgr.com

James C. Yoon, CA Bar #177155
(*pro hac vice application pending*)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

Dale R. Bish, CA Bar #235390
(*pro hac vice application pending*)
**WILSON SONSINI GOODRICH & ROSATI**
Professional Corporation
650 Page Mill Road
Palo Alto, CA 94304-1050
Telephone: (650) 493-9300
Facsimile: (650) 565-5100
Email: jyoon@wsgr.com
          dbish@wsgr.com

Stefani E. Shanberg, CA Bar #206717
(*pro hac vice application pending*)
**WILSON SONSINI GOODRICH & ROSATI**
Professional Corporation
One Market Plaza
Speak Tower, Suite 3300
San Francisco, CA 94105-1126
Telephone: (415) 947-2000
Facsimile: (415) 947-2099
Email: sshanberg@wsgr.com

Attorneys for Plaintiffs
HTC Corporation and HTC America, Inc.

**WILSON SONSINI GOODRICH & ROSATI**
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699